USDC SDNY
DOCUMENT ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 9-29-16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
Xavier Sanchez,
                           Plaintiff,

         -against-                                             15-cv-5142
                                                           **OPINION & ORDER**
Carolyn Colvin, Acting Commissioner of
Social Security,
                         Defendant.
------------------------------------------------------------ X

**ANDREW L. CARTER, JR., District Judge:**

## I.    Introduction

Plaintiff Xavier Sanchez brings this action pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 405(g) (the "Act") to review the final determination of Defendant Carolyn Colvin, Acting Commissioner of Social Security (the "Commissioner"), denying his claims for Supplemental Security Income benefits ("SSI") under the Act. Plaintiff has moved and the Commissioner has cross-moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). The issue on these cross-motions is whether substantial evidence supports the Commissioner's finding that Plaintiff is not "disabled" for purposes of entitlement to SSI under the Act. The Court has reviewed the record and concluded, for the reasons stated below, the cross-motions are denied, the Commissioner's decision is reversed, and the matter is remanded for further proceedings.

## II.    Facts Before the Administrative Law Judge
###     A. Medical Evidence

Plaintiff failed an application for SSI on March 3, 2012, alleging that he had been disabled since January 15, 2010. Tr. 17. Plaintiff's application was denied initially, and he requested a hearing before an administrative law judge ("ALJ"). Tr. 17. On August 5, 2013, Plaintiff appeared with counsel and testified before ALJ Margaret L. Pecoraro. Tr. 17-29. On November 7, 2013, the ALJ issued a decision finding that Plaintiff was not disabled under the Act. Tr. 29. Plaintiff

requested review by the Appeals Council, and on May 13, 2015, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's determination the final decision of the Commissioner. Tr. 1-6.

The record before the ALJ established that Plaintiff sustained a work-related accident as a steel worker that resulted in injuries to his cervical spine, lumbar spine, left hip, and left shoulder. Tr. 22, 360. On January 26, 2010, a scan of Plaintiff's left shoulder showed a fracture of the posterolateral superior humeral head, and moderated glenohumeral joint effusion. Tr. 298-99. A February 2, 2010 MRI of Plaintiff's lumbar spine showed a large right paracentral disc extrusion with an extended disc fragment extending inferiorly from the disc at the L5-S1 level, with compression of the right descending S1 nerve root resulting in sever central canal stenosis and severe right foraminal stenosis. Tr. 264-265. The MRI also showed a central disc extrusion at the L4-L5 level extending slightly superiorly and inferiorly from the disc and mild facet arthropathy resulting in mild central canal stenosis and sever bilateral foraminal stenosis. Id.

A February 2, 2010 MRI of the cervical spine showed multilevel sponylotic disc disease and bilateral uncovertebral hypertrophy, including mild diffuse osteophyte complex at c506, with a superimposed right paracentral disc herniation abutting the right anterior spinal cord and causing mild right lateral recess narrowing. Tr. 292-294. The MRI also demonstrated mild central stenosis at C4-5 and C5-6, with additional multilevel bilateral foraminal narrowing. Id.

Plaintiff began treatment with Dr. Steven Touliopoulos, with University Orthopedics of New York, on March 8, 2010. Tr. 23. On that date, Dr. Touliopoulos noted that Plaintiff had a medical history of protein C deficiency for which he was taking Coumadin, and an examination of Plaintiff's left shoulder revealed tenderness, limited range of motion, and spasm. Tr. 391. Dr. Touliopoulos recommended left shoulder surgery. Tr. 392. Dr. Touliopoulos examined Plaintiff

again on September 1, 2010, and continued to recommend surgery. Tr. 387. On September 16, 2010, Dr. Touliopoulos performed arthroscopic repair on Plaintiff's left shoulder at New York Downtown Hospital. Tr. 269-71, 382-84. On September 29, 2010, Dr. Touliopoulos examined Plaintiff and noted that Plaintiff complained of limited range of motion in the left shoulder, moderate to significant limitation in range of motion of the left hip, and tenderness and spasms in the lumbar spine, with restricted range of motion. Plaintiff was prescribed Percocet to help manage the pain. Tr. 379. Dr. Touliopoulos considered Plaintiff to be "presently disabled from all work." Tr. 379.

Plaintiff saw Dr. Touliopoulos on April 11, 2011, and reported modest improvement with respect to pain in his left shoulder. Tr. 369. However, Plaintiff complained of residual stiffness and weakness in his left shoulder, increasing symptoms in his left hip, and back pain. Tr. 369. Dr. Touliopoulos noted that Plaintiff had returned to his construction job on light duty, but that he had difficulty performing the light duties and was currently not working. Tr. 369. Dr. Touliopoulos requested authorization for an MRI scan of Plaintiff's left hip. Tr. 370.

On April 22, 2011, Andrew Merola, M.D., a spine surgeon, evaluated Plaintiff as pursuant to a referral from Dr. Touliopoulos. Tr. 217-18. Dr. Merola noted that Plaintiff complained of significantly progressive neck pain radiating to his upper extremities, as well as low back pain radiating to his lower extremities. Tr. 217, 229. Dr. Merola further noted that Plaintiff had an antalgic and kyphotic gait and posture, and needed assistance robing and disrobing as well as getting and off the examination table, because of difficulty rotating his head, neck and low back. Tr. 217-18. Dr. Merola reported that spasm was palpable in Plaintiff's neck and lower back, and that there was atrophy and weakness in Plaintiff's left deltoid and biceps muscles. Tr. 217-18. Dr. Merola noted that the cervical spine MRI showed herniation at multiple disc levels with spinal

3

stenosis, and that the MRI of Plaintiff's lumbar spine showed a discrete disc herniation at the L5-S1 level. Tr. 218, 230; see Tr. 264-65. Dr. Merola concluded that Plaintiff may benefit from surgery and asked Plaintiff to return in four to six weeks. Tr. 218, 230. Dr. Merola completed a doctor's report for the State of New York Workers' Compensation Board, and checked a box indicating that Plaintiff could not return to work. Tr. 213-16.

On May 5, 2011, Dr. Charles DeMarco, with University Orthopedics of New York, examined Plaintiff. Tr. 259. Dr. DeMarco noted that Plaintiff indicated he was experiencing moderate improvement in pain and function in his left shoulder, but still had stiffness, weakness, discomfort, and intermittent pain aggravated by moderate to heavy lifting, repetitive activities and overhead activities. Tr. 259. Plaintiff also complained of low back pain, and Dr. DeMarco noted that Plaintiff was receiving physical therapy three times a week. Tr. 259. Dr. DeMarco further noted that Plaintiff returned to light duty work as a construction worker but had difficulty with the restricted duties because he had difficulty using a sling hook. Tr. 259. Dr. DeMarco concluded that the only option for treating the left his was surgical intervention, and referred Plaintiff to pain management. Tr. 259.

Plaintiff returned to Dr. Merola on May 13, 2011. Tr. 221. Dr. Merola reported that the diagnostic studies showed that significant herniation was producing cervical and lumbar radiculopathy, potentially requiring surgery. Tr. 221. However, Dr. Merola concluded that Plaintiff was not a candidate for surgery because he had a history of protein C deficiency for which he was taking Coumadin, and referred Plaintiff to pain management. Tr. 221. Dr. Merola filled out a Workers' Compensation Board Progress report, noting that Plaintiff could not return to work. Tr. 222-223.

On May 27, 2011, Dr. Kioomars Moosazadeh, with University Orthopedics of New York, examined Plaintiff and prescribed Percocet and a Lidoderm patch for shoulder pain. Tr. 262. On June 2, 2011, Dr. Moosazadeh filled out New York State Workers' Compensation Board Progress Report and indicated that Plaintiff was working. Tr. 261. On August 2, 2011, Plaintiff returned to Dr. Moosazadeh, who noted that Plaintiff was taking Vicodin for left shoulder and lower back pain, and had returned to work full-time. Tr. 255. While Dr. Moosazadeh noted that Plaintiff complained of pain in the right shoulder, left shoulder, and lower back, Dr. Moosazadeh concluded that Plaintiff could not receive an injection to treat the pain because of his medication for protein C deficiency. Tr. 255. On August 29, 2011, Plaintiff returned to Dr. Moosazadeh and reported that the pain in his cervical spine, left shoulder and lower back was "intolerable" such that he could no longer continue to work. Tr. 252. Dr. Moosazadeh gave Plaintiff a prescription for Percocet, and asked Plaintiff to continue to modify his activities. Tr. 252.

On September 14 and 21, 2011, Dr. Touliopoulos examined Plaintiff, who reported "modest improvement in overall level of pain." Tr. 356-57, 373-74. However, Plaintiff also complained of limited motion, loss of strength, and intermittent pain in his left shoulder, increasing pain in his right shoulder, and difficulties with repetitive activities, light lifting, and overhead activities. Tr. 356. Dr. Touliopoulos noted that while Plaintiff was working, he had difficulty performing his work duties; Dr. Touliopoulos advised Plaintiff to stop working, recommended left hip surgery, and ordered an MRI for the right shoulder. Tr. 356-57.

Dr. Moosazadeh examined Plaintiff again on October 10, 2011, noted that he had stopped working two weeks before "as a result of painful disabled condition," and advised Plaintiff to return for reevaluation. Tr. 249. On October 27, 2011, Dr. Moosazadeh examined Plaintiff and concluded that he would benefit from a cortisone injection, but required medical clearance from

5

his primary care physician. Tr. 246. Dr. Moosazadeh also noted that Plaintiff "remained disabled from his employment." Tr. 246.

When Plaintiff returned to Dr. Touliopoulos on November 23, 2011, Plaintiff complained of difficulty sitting, standing, lifting and carrying due to his hip, back and left shoulder symptoms. Tr. 352. Dr. Touliopoulos concluded that Plaintiff remained totally disabled from his employment because of left shoulder and left hip injuries, prescribed Percocet, recommended left hip surgery, and requested an MR for the left shoulder. Tr. 353-54. On December 9, 2011, Dr. Moosazadeh examined Plaintiff, noted that his primary care physician cleared him for a cortisone injection, and consequently gave plaintiff an injection in the left shoulder "with fast response in proving the pain." Tr. 240. Plaintiff returned to Dr. Moosazadeh on December 22, 2011, reporting that the injection in the left shoulder had helped; Dr. Moosazadeh gave Plaintiff an injection in the left shoulder. Tr. 237.

On January 4, 2012, Dr. Touliopoulos examined Plaintiff, who reported that he was taking five to six Percocet daily because of his level of pain. Tr. 348-49. Dr. Touliopoulos recommended left hip surgery, but noted that Plaintiff deferred the surgery because of ongoing lower back pain and left shoulder symptoms. Tr. 348. Dr. Touliopoulos concluded that Plaintiff remained totally disabled from his employment and prescribed Percocet. Tr. 349. Plaintiff returned to Dr. Touliopoulos on February 24, and March 6, 2012, with similar results. Tr. 345, 342.

On March 26, 2012, Dr. Touliopoulos examined Plaintiff, who stated that while he tried to return to work, he was unable to perform his work duties due to his impairments. Tr. 201. Dr. Touliopoulos stated that he recommended surgery for Plaintiff's left hip, but that Plaintiff opted for continuing conservative management in light of his protein C deficiency. The doctor stated that

Plaintiff remained totally disabled from his employment because of his left hip and left shoulder. Tr. 201, 339, 330.

Plaintiff returned to Dr. Touliopoulos on April 18, 2012, reporting that while his shoulder pain improved, he still had shoulder weakness, soreness, discomfort, and stiffness. Tr. 199-200. Dr. Touliopoulos also noted that Plaintiff claimed that he had difficulty performing repetitive activities with his left arm and overhead activities with moderate to heavy lifting, that Plaintiff was taking Percocet which helped his symptoms, and that he had difficulty walking without Percocet. Tr. 199. Dr. Touliopoulos recommended lumbar spine surgery but noted that Plaintiff could not undergo surgery because of significantly increased risk factors due to underlying hematological condition. Tr. 200. Dr. Touliopoulos repeated his view that Plaintiff was totally disabled from his employment as a result of the injuries to his left hip and left shoulder. Tr. 200.

On May 16, 2012, Dr. Touliopoulos again examined Plaintiff. Tr. 326-27. Dr. Touliopoulos noted that the pain in Plaintiff's left shoulder had improved but that Plaintiff was still complaining of discomfort, stiffness and weakness, and that Plaintiff had difficulty with moderate to heavy lifting, overhead lifting, and repetitive lifting. Tr. 326. Dr. Touliopoulos also noted that Plaintiff's left hip symptoms persisted and were aggravated by prolonged sitting and standing, and that Plaintiff required Percocet daily for pain control. Tr. 326. Dr. Touliopoulos noted that Plaintiff walked with an antalgic gait, and had difficulty mounting and dismounting the examination table. Tr. 326. Examination of Plaintiff's left shoulder showed no significant soft tissue swelling, but rotator cuff strength was moderately diminished compared to the right. Examination of Plaintiff's left hip revealed moderately to significantly restricted motion; examination of Plaintiff's cervical spine found significant spasm; and examination of the lumbar spine also revealed spasm and significantly restricted flexibility. Tr. 326. The doctor also reported atrophy and weakness in

Plaintiff's thighs and quadricep muscles. Tr. 326. Dr. Touliopoulos referred Plaintiff to Dr. Gasalberti for pain management and renewed the prescription for Percocet. Tr. 327. He also stated that Plaintiff remained totally disabled from his employment. Tr. 327.

Dr. Yakov Perper, with Universal Pain Management, examined Plaintiff on July 14, 2012, for pain in his lower back, neck, shoulders and left hip. Tr. 289-91. Dr. Perper observed that Plaintiff was in no acute distress and that his gait was normal. Tr. 290. Examination of Plaintiff's cervical spine revealed tenderness on palpation, with full strength in both wrists. Tr. 290. Examination of Plaintiff's lumbar spine also revealed tenderness to palpation and decreased sensation to pin prick, and examination of Plaintiff's left shoulder revealed limited range of motion. Tr. 290. Dr. Perper prescribed Percocet. Tr. 291.

One month later, Dr. Perper again examined Plaintiff, who claimed that he could not sit or stand for long periods without experiencing severe pain. Tr. 286. Dr. Perper again reported that Plaintiff was in no acute distress and had a normal gait. Tr. 287. When Dr. Perper saw Plaintiff on September 7, 2012 (Tr. 283-85), October 5, 2012 (Tr. 280-82) and November 2, 2012 (Tr. 277-79), Plaintiff reported the same complaints and Dr. Perper's physical examination findings remained the same. Tr. 284. While Dr. Perper saw Plaintiff again on November 30, 2012 (Tr. 275-76), and on December 28, 2012 (Tr. 273-74), and Plaintiff reported the same complaints as he did during the earlier visits (Tr. 275, 273), Dr. Perper did not report physical examination findings. Tr. 276, 274.

On December 7, 2012, MRI of Plaintiff's hips showed a tear of the left labrum, mild and early osteoarthritis in both hips, and mild tendinosis of the left hamstring tendons. Tr. 418. On January 25, 2013, Dr. Perper examined Plaintiff, who complained that severe back pain was relieved by medication. Tr. 414. Plaintiff continued to report that he could not sit or stand for long

without experiencing severe pain, and Dr. Perper again observed that Plaintiff was in no acute distress and had a normal gait. Tr. 414. Dr. Perper advised Plaintiff to continue taking Percocet. Tr. 415-16.

Dr. Perper examined Plaintiff on February 22, 2013, and Plaintiff reported the same complaints. Tr. 412. Dr. Perper noted that Plaintiff was in no acute distress and that Plaintiff stated that pain medication had "significantly improved [his] quality of life," such that he was able to engage in activities of daily living. Tr. 412. Plaintiff returned to Dr. Perper on March 22, 2013, reporting that the pain was "excruciating." Tr. 408. Dr. Perper gave Plaintiff a trigger point injection for myofascial pain syndrome, and during a return visit on April 18, 2013, Plaintiff reported that the injection had helped decrease the pain, and asked for a repeat injection. Tr. 407. 404. Dr. Perper reported physical examination findings similar to the findings reported during earlier visits, and gave Plaintiff an injection in the left hip joint. Tr. 405, 403. On May 16, 2013, Plaintiff saw Dr. Perper and reported that the left hip injection had helped decrease the pain, and asked for a repeat injection. Tr. 400-402. Dr. Perper's examination findings were similar to earlier findings, and he diagnosed degenerative cervical and lumbar spine disease, and osteoarthritis in multiple joints. Tr. 401. Plaintiff returned to Dr. Perper on June 17, 2013 and July 13, 2013. Tr. 394-399. During these visits, Plaintiff reported similar symptoms, and Dr. Perper noted similar observations and examination findings. Tr. 398, 395.

### B. *Plaintiff's Testimony*

Plaintiff testified that after his January 2010 injury, he had returned to work in February 2011 as a signal man, which required him to stand for seven hours a day and to move steel. Tr. 39-41. Plaintiff stated that he could no longer do the job because he began experiencing right shoulder pain from overuse. Tr. 41. Plaintiff testified that during the school year, he drove his

9

eight year-old daughter to school and attended her school plays, but that sitting for more than half an hour caused pain in his back and numbness in his left leg. Tr. 16-17, 43, 48. Plaintiff also testified that he took his sixteen year-old son to football practice twice a week, and remained at the park for about two hours watching practice. Tr. 49. Plaintiff further testified that he drove 20 to 45 minutes on Sundays to attend church, that his hobby was photography, and that he used the computer and maintained a Facebook page. Tr. 46-47. Plaintiff stated that he is unable to sit for more than an hour without needing to move around. Tr. 16-17. He relies on his wife for assistance with household chores. Tr. 9. Plaintiff requires Percocet every day for pain management, which causes side effects, including the reduced ability to be intimate with his wife, mood swings, and increased appetite. Tr. 10.

### C. *Consultative Review by Internist and Vocational Expert*

On May 8, 2012, Dr. John Joseph examined Plaintiff pursuant to a referral from the Social Security Division of Disability Determination. Tr. 202-05. Dr. Joseph noted that Plaintiff complained of pain in both shoulders, daily headaches, and low back pain radiating to his legs. Tr. 202. Dr. Joseph also noted that Plaintiff indicated that he helped his wife with cooking, cleaning, washing laundry and shopping when he could. Tr. 203. Dr. Joseph observed that Plaintiff did not appear to be in acute distress, had a normal gait and stance without need for an assistive device, was able to walk on his heels and toes without difficulty, squat fully, and needed no help changing for the exam or getting on and off the examination table or rising from a chair. Tr. 203. Dr. Joseph found full range of motion in Plaintiff's cervical spine; limited motion in Plaintiff's lumbar spine, limited range of motion in both shoulders; and full range of motion in the elbows, forearms, wrists, hips and knees. Tr. 204. Dr. Joseph diagnosed history of headaches due to cerebral thrombosis as a result of protein C deficiency, low back pain due to herniated disc, osteoarthritis of the shoulders,

and status post-surgery for bilateral rotator cuff tears. Tr. 205. Dr. Joseph opined that Plaintiff was restricted for heavy lifting and carrying because of disc disorder in the lower back. Tr. 205.

Dr. Chan Iliov (rendered "Eliav" in the hearing decision) testified as a medical expert. Tr. 52-62. Dr. Iliov examined the February 11, 2010, MRI of Plaintiff's left hip, and noted that there was no fracture, avascular necrosis or labral tear. Tr. 56-57. Dr. Iliov also examined the January 26, 2010, MRI of the left shoulder, and noted deformity of the humeral head, debris in the joint, and no tear of the rotator cuff. Tr. 57. Dr. Iliov discussed Dr. Touliopoulos' medical notes, and specifically focused on the most recent report indicating that Plaintiff had moderately reduced power in the left shoulder, positive Faber test of the left hip and hip impingement. Tr. 57.

Dr. Iliov further noted that Plaintiff underwent left shoulder surgery on September 16, 2010, to address its instability. Tr. 58. Dr. Iliov explained that Dr. Touliopoulos, Dr. Perper, and Dr. Joseph reported non-focal findings, meaning that muscle power, reflexes, and sensation were intact. Tr. 58. Dr. Iliov noted that these findings contrast with the findings of Dr. Merola, who found signs of neurological impairment such as Hoffman sign in the right hand. Tr. 58. Dr. Iliov explained that because there is no other evidence of myelopathy or spinal cord injury in the record, Dr. Merola's neurological findings appeared to be "an outlier." Tr. 58. Dr. Iliov also concluded that while the neurological findings are not consistent, the record established that Plaintiff continually complained of pain, and has herniated discs in his neck and back, left shoulder instability, and impingement in the left hip. Tr. 59.

As a result, Dr. Iliov concluded that while Plaintiff's impairments do not "equal[] or me[e]t" the severity listings (discussed below), Plaintiff did have functional limitations preventing him from performing heavy lifting. Tr. 59. Specifically, Dr. Iliov concluded that Plaintiff could occasionally lift up to 20 pounds and frequently lift up to 10 pounds, and that Plaintiff could sit

for six to eight hours a day with a five-minute break every hour. Tr. 59-60. Dr. Iliov further concluded that Plaintiff could stand and/or walk for two to four hours a day with a five-minute break every hour. Tr. 60. He also opined that Plaintiff could occasionally reach overhead, kneel, bend, and climb stairs, but could not climb a ladder or crawl. Tr. 60.

Amy Leopold, a vocational expert, also testified at the hearing. Tr. 62-68. The ALJ asked the vocational expert to assume that an individual could lift and carry 20 pounds occasionally, and 10 pounds frequently, sit for six to eight hours a day with a five-minute break every hour, and stand and/or walk for two hours in an eight-hour day with a five-minute break every hour. Tr. 64. The ALJ also asked the vocational expert to assume that the individual was limited to occasional overhead reaching, occasional bending, kneeling, and stair climbing, and totally precluded from climbing ladders and crawling. Tr. 65. The vocational expert testified that such an individual could work as an order clerk (of which there were 215,000 jobs in the nation and 11,000 in the region), as a dispatcher (of which there was 184,000 in the nation and 12,000 in the region), as a table worker (of which there was 454,000 in the nation and 16,000 in the region), or an assembler (of which there was 218,000 in the nation and 6,200 in the region). Tr. 65-66.

The vocational expert did not consider whether an individual would be capable of working in these positions while taking Percocet on a daily basis.

### D. *The ALJ's Determination*

First, the ALJ found that while Plaintiff had engaged in substantial gainful activity from February 2001 through September 26, 2011, there had been a continuous 12-month period during which Plaintiff did not engage in substantial gainful activity. Tr. 20. Next, the ALJ found that Plaintiff's lumbar disc disease, protein C deficiency, and arthritis were severe impairments. Tr. 20. The ALJ found that Plaintiff's impairments did not meet or medically equal any listed

impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. She next proceeded to determine Plaintiff's "residual functional capacity." Tr. 20.

Evaluating Plaintiff's residual functional capacity, the ALJ determined that Plaintiff could not perform any past relevant work. Tr. 27. She did, however, conclude that Plaintiff could perform sedentary work, lift or carry 20 pounds occasionally, sit 6 to 8 hours with a five-minute break every hour, stand or walk for 2 hours in an eight-hour work day with a five-minute break every hour, and occasionally reach overhead, bend, kneel, and climb stairs. Tr. 20. In making this determination, the ALJ stated that she considered all of Plaintiff's symptoms, the medical evidence, and the opinion evidence. Tr. 20-27.

With regard to the evidence from Plaintiff's treating physician, Dr. Touliopoulis, who had treated Plaintiff on a continuous basis from March 2010 through January of 2013, the ALJ stated that she was affording his opinion significant weight. She lent the reports of the remaining physicians "only some weight because they suggest that [Plaintiff] has significant limitations, which is consistent with the record . . . however . . . these opinions are conclusory and vague in not providing function by function limitations. Decision at 8. The ALJ accordingly forwent engaging in a function by function assessment of Plaintiff's ability to perform all of the exertional requirements of sedentary work – namely, Plaintiff's ability to sit, stand, walk, lift, and carry.

The ALJ afforded considerable weight to the opinion of Dr. John Joseph, to whom Plaintiff was referred by the Division of Disability Determination in May 2012 for an internal medicine examination. She also relied heavily on the report of Dr. Eliav, who performed a review of the medical records, but never conducted an examination of Plaintiff.

Despite repeated evidence in the record to the contrary, the ALJ concluded that "there is no evidence of nerve root compression characterized by neuro-anatomic distribution of pain with

limitation of motion of the spine, motor loss involving atrophy with associated muscle weakness, sensory, or reflex loss, or positive straight leg raise results." Decision at 4. See Tr. 263-265, 292-294, 199-205, 212-233, 272-291, 300-302 (noting antalgic gait, diminished sensation and positive results on straight leg raising tests, further indicating nerve root irritation). She further stated that she did not find Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms entirely credible. Decision at 6.

Nevertheless, the ALJ relied on the testimony of the vocational expert to conclude that that there were other jobs existing in significant numbers in the national economy that Plaintiff could perform, namely the jobs of order clerk, dispatcher, table worker, and assembler. Tr. 27-28. Because there was other work that Plaintiff could perform, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

### III.  Legal Standards

#### A. *Disability Determination – The Five Step Evaluation Process*

The Social Security Act defines "disability" to include the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). In addition, the Act requires that a claimant's physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. Id. at § 423(d)(2)(A).

The agency has prescribed a five step evaluative process to be employed in determining whether an individual is disabled. See 20 C.F.R. §§ 404.1520, 416.920. The Court of Appeals for the Second Circuit has described this five-step process as follows:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical capacity to do basic work activities.
3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.
4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.
5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw, 221 F.3d at 132 (2d Cir. 2000); see also Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Lora v. Massanari, 2002 WL 655208, at *5 (S.D.N.Y. Apr. 18, 2002).

The claimant bears the initial burden of proving that he is disabled within the meaning of the Act. See 42 U.S.C. § 423(d)(5); see also Shaw, 221 F.3d at 132. This burden encompasses the first four steps described above. See Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983). If the claimant satisfies the burden of proof through the fourth step, he has established a *prima facie* case and the burden shifts to the Commissioner to prove the fifth step. In meeting her burden of proof on the fifth step, the ALJ must give controlling weight to the opinion of a treating physician on the issue of the nature and severity of a claimant's impairment, if that opinion "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not

15

inconsistent with the other substantial evidence in the case record." 20 C.F.R. § 404.1527(d)(2); see also Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002). The Treating Physician Rule recognizes that a claimant's treating sources, which in most cases are medical professionals, are more apt to "provide a detailed, longitudinal picture of [the patient's] medical impairment(s) and may bring a unique perspective to the medical findings" as opposed to an evaluation of a one-time non-examining, non-treating physician. 20 C.F.R. § 404.1527(d)(2); see Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).

If the treating physician's opinion is not given controlling weight, the weight to be afforded to the opinion is to be based on several factors, which include: (1) the length, nature and extent of the treatment relationship, including the frequency of examination; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the medical opinion with the medical record as a whole; (4) whether the treating physician is a specialist; and (5) any other relevant factors that tend to support or contradict the treating physician's opinion. 20 C.F.R. § 404.1527(d)(2) (cited in Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998)).

The ALJ, under appropriate circumstances, may rely on the medical vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the grids." The grids take into account the claimant's residual functional capacity in conjunction with the claimant's age, education, and work experience. Based on these factors, the grids indicate whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the grids is dispositive on the issue of disability. However, the grids are not dispositive where they do not accurately represent a claimant's limitations because the claimant suffers from non-exertional limitations that significantly limit his capacity to work. Pratts v. Chater, 94 F.3d 34, 38 (2d Cir. 1996); Zorilla v. Chater, 915 F.Supp. 662, 667 (S.D.N.Y. 1996).

Thus, to create an irrebuttable presumption of disability under the regulations, the claimant must either have a "listed impairment," 20 C.F.R. §§ 404.1520(d), 416.920(d), or one that is "equal to" a listed impairment, id. at §§ 404.1520(d), 416.920(d).

### B. Standard of Judicial Review

A court's review under the Act of a final decision by the Commissioner is limited. A court does not consider the case *de novo*, rather a court may set aside a determination only if it is based on legal error or is not supported by substantial evidence in the record. See 42 U.S.C. §§ 405(g); Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). Succinctly, "substantial evidence" is "more than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991).

The ALJ must set forth the crucial factors supporting the decision with sufficient specificity. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). Obvious omissions in the factual record must be developed by the ALJ. Shaw, 221 F.3d at 134 ("for the ALJ to conclude that Plaintiff presented no evidence of disability at the relevant time period, yet to simultaneously discount the medical opinion of his treating physician, violates his duty to develop the factual record."). In analyzing a treating physician's report, "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999).

Where the ALJ's findings are supported by substantial evidence, a court may not interject its interpretation of the administrative records. Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988); 42 U.S.C. § 405(g). Where the weight of the evidence, however, does not

meet the requirement for substantial evidence or a reasonable basis for doubt exists as to whether correct legal principles were applied, the ALJ's decision may not be affirmed. In such a case the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to develop a full and fair record or to explain his or her reasoning. Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980).

### IV.   Discussion

Plaintiff asserts that the ALJ's determination must be reversed because the ALJ's conclusion that Plaintiff has the residual functional capacity to perform sedentary work is not supported substantial evidence. The ALJ undertook the appropriate sequential inquiry in Plaintiff's case. First, she found that Plaintiff had not engaged in substantial gainful activity for a period exceeding 12 months. Second, she found that Plaintiff had severe impairments. Third, she determined that Plaintiff's impairments did not meet or equal the medical criteria of any condition described in the Listings of Impairments contained in 20 C.F.R. Part 404, Appendix 1 to Subpart P. As to the fourth step, the ALJ determined that Plaintiff was unable to perform his past relevant work because his job as a steel worker was performed at a heavy exertion level.

With respect to the fifth and final step, for which the Commissioner bears the burden of proof, the ALJ did not have substantial evidence to determine that Plaintiff could perform sedentary work. First, the ALJ concluded that "there is no evidence of nerve root compression characterized by neuro-anatomic distribution of pain with limitation of motion of the spine, motor loss involving atrophy with associated muscle weakness, sensory, or reflex loss, or positive straight leg raise results." Decision at 4. However, the record contains evidence that Plaintiff had nerve root compression, antalgic gait, diminished sensation and positive results on straight leg raising

tests, further indicating nerve root irritation. See Tr. 263-265, 292-294, 199-205, 212-233, 272-291, 300-302.

Moreover, the ALJ committed legal error. She gave little weight to the opinions rendered by Plaintiff's physicians, while giving controlling weight to the opinion of the non-examining consultants, on the basis that the medical opinions where conclusory and vague. Decision at 8. Such analysis violated the Treating Physician Rule. Plaintiff had visited all of his physicians on a continuous basis — with the shortest period being six months and the longest being three years. The record developed by Plaintiff's physicians is consistent with Plaintiff's testimony, including his subjective assessment of his pain tolerance, how much he can lift, and how long he can endure standing, walking, and sitting. The ALJ's conclusion was legal error.

Additionally, the ALJ's decision to ignore the medical records of the majority of Plaintiff's doctors precluded the ALJ from having the necessary factual record to provide a function by function assessment of Plaintiff's ability to perform all of the exertional requirements of sedentary work. With the relevant medical evidence removed from her consideration, the ALJ should have developed the factual record in order to obtain the facts necessary to provide the assessment. See Shaw, 221 F.3d at 134. In so doing, the ALJ applied the incorrect legal standard, warranting remand.

### V.     Conclusion

In light of the foregoing discussion, the ALJ failed to apply the correct legal standards and rendered a determination that was not grounded in substantial evidence. Thus, the Court cannot uphold the ALJ's determination. In determining the final disposition of this matter, the most equitable judgment must be implemented. The Court has authority to reverse with or without remand. 42 U.S.C. § 405(g).

"Upon a finding that an administrative record is incomplete or that an ALJ has applied an improper legal standard, we generally . . . remand the matter to the Commissioner for further consideration." Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000) (citation omitted). Accordingly, because the ALJ failed to adequately develop the record in reaching a determination of Plaintiff's residual functional capacity, the case should be remanded to the Commissioner to further develop the record.

Wherefore, it is hereby ORDERED that the Commissioner's decision denying disability benefits is REVERSED and this matter is REMANDED to the Commissioner pursuant to Sentence Four of 42 U.S.C. § 405(g), for further proceedings consistent with the above; and it is further ORDERED, that the Clerk of the Court serve a copy of this Memorandum–Decision and Order upon the parties to this action.

**SO ORDERED.**

Dated: September 29, 2016
New York, New York

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**